UNITED STATES, Appellee

v.

David C. ELLERBROCK, Private First Class
U.S. Army, Appellant

No. 10-0483

Crim. App. No. 20070925

United States Court of Appeals for the Armed Forces

Argued January 25, 2011

Decided August 31, 2011

STUCKY, J., delivered the opinion of the Court, in which EFFRON, C.J., and ERDMANN, J., joined. BAKER, J., filed a dissenting opinion. RYAN, J., filed a dissenting opinion.


Counsel


For Appellant: Captain Barbara A. Snow-Martone (argued); Colonel Mark Tellitocci, Lieutenant Colonel Imogene M. Jamison, Lieutenant Colonel Jonathan F. Potter, and Major Peter Kageleiry (on brief); Captain Shay Stanford and Captain Sarah E. Wolf.


For Appellee: Captain Frank E. Kostik Jr. (argued); Major Christopher B. Burgess and Major LaJohnne A. White (on brief); Captain Christopher B. Witwer.


Military Judges: Tara A. Osborn and Donna M. Wright


**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

Judge STUCKY delivered the opinion of the Court.

We granted review to determine whether the military judge erred in applying Military Rule of Evidence (M.R.E.) 412 to prevent Appellant from introducing evidence of the alleged victim's first marital affair to show a motive to fabricate the accusation against Appellant.[1]  We hold that the evidence was constitutionally required, that the military judge abused her discretion by refusing to admit the evidence, and that it was not harmless beyond a reasonable doubt.

I.

A.

In accordance with his pleas, Appellant was found guilty of conspiracy, destruction of military property, larceny of military property, larceny, and housebreaking in violation of Articles 81, 108, 121, and 130, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 908, 921, 930 (2006).  Contrary to his pleas, Appellant was found guilty of rape and sodomy by force in violation of Articles 120, 125, UCMJ, 10 U.S.C. §§ 920, 925 (2006).  This appeal is limited to the latter charges. Appellant was sentenced to a dishonorable discharge, twenty-five years of confinement, forfeiture of all pay and allowances, and

---

[1] We also granted review of the constitutionality of M.R.E. 412(c)(3), an issue this Court addressed in United States v. Gaddis, No. 10-0512, 2011 CAAF LEXIS 669, 2011 WL 3518169 (C.A.A.F. Aug. 10, 2011).

reduction to the lowest enlisted grade.  The convening authority approved the sentence, and the United States Army Court of Criminal Appeals (CCA) affirmed.  United States v. Ellerbrock, No. ARMY 20070925, 2010 CCA LEXIS 32, at *16, 2010 WL 3931488, at *5 (A. Ct. Crim. App. Mar. 26, 2010).

B.

On April 10, 2007, the victim, CL, was spending time with a family friend, Specialist (SPC) Jackson.  CL's husband had just deployed, and her husband had asked SPC Jackson to look after CL.  At 8:30 p.m., CL put her child to bed, and at around 9:00, she began to drink and ultimately consumed about a third of a pint of gin, which is three to four shots.  After SPC Jackson decided to go home, CL testified that she took 2.5 milligrams of Xanax[2] to help her sleep.  She had also taken .75 milligrams of Effexor[3] earlier in the day.

Shortly thereafter, CL's friend, Ms. Vantrease, called and said that she was coming over.  She brought with her Mr. Page and Appellant; SPC Jackson also stayed.  CL had met Appellant earlier in the year when Ms. Vantrease introduced them to one another.

---

[2] According to the toxicologist's testimony, Xanax is prescribed for anxiety disorders.  As the expert explained, Xanax affects on neurotransmitters in the brain to increase sedation.

[3] According to the toxicologist's testimony, Effexor affects the neurotransmitters in the brain to combat anxiety and depression. Mild sedation is also a possible side effect.

After her friends arrived, CL drank two hard lemonades. As the CCA noted, there was conflicting testimony about whether CL had also snorted lines of Xanax, but, by 11:00 p.m., CL was "'a little louder than usual, kind of stumbling, but other than that, fine . . . maybe slightly intoxicated.'" Ellerbrock, 2010 CCA LEXIS 32, at *2-*3, 2010 WL 3931488, at *1.

Sometime after 11:00 p.m., SPC Jackson and Ms. Vantrease went to the shoppette. Mr. Page, Appellant, and CL remained in the house, but Mr. Page soon left to sit in his car and await the return of SPC Jackson and Ms. Vantrease. When Mr. Page left, he stated that CL did not look drunk, passed out, blacked out, or otherwise incapacitated. By contrast, Ms. Vantrease testified that, before she left for the shoppette, CL was passed out in the bathroom. SPC Jackson testified that, before he left with Ms. Vantrease, CL was either on the couch or the bathroom floor, but he could not remember which.

Approximately thirty minutes passed while Mr. Page sat in his car awaiting the return of SPC Jackson and Ms. Vantrease. When they returned, Ms. Vantrease went to find CL in the apartment, while SPC Jackson and Mr. Page stayed outside. In less than a minute, Ms. Vantrease returned and told Mr. Page and SPC Jackson that she had heard sexual noises coming from the bedroom. Mr. Page's testimony contradicted Ms. Vantrease's testimony on this point, as he claimed that she told them that

4

CL was passed out in the bathroom when she went to check on her. When the three went inside, they heard sexual noises, which were described as the bed squeaking and people moaning.

Ms. Vantrease opened the bedroom door and turned on the lights, revealing Appellant having sex with CL. The testimony from the witnesses regarding CL's mental awareness ranged from SPC Jackson's testimony that he saw her flinch to Mr. Page's testimony that he saw no movement from CL and believed she had no control over her mental or physical faculties. A toxicologist testified that CL likely "exhibit[ed] anywhere from minimal effects of sedation . . . to being precomatose," all of which was dependent on numerous factors, few of which are discussed in the evidence.

Someone told Appellant to get off CL. Appellant allegedly responded by telling the group to leave because he was "almost done." The three witnesses left the room and the apartment. When CL finally spoke with SPC Jackson the next morning, she said that she remembered having sex with Appellant and said something to the effect of, "I can't believe I did that" and "I fe[el] horrible."

## II.

At trial, Appellant moved under M.R.E. 412 to introduce testimony that CL had engaged in a prior extramarital affair to support his theory that CL had a motive to lie about the

consensual nature of the sex with him, which was to protect her marriage. The military judge considered the following evidence in making her decision.

## A.

At the time of the alleged rape, CL had been married to her husband for approximately three years, but they had known each other for five years before they married. Approximately six months into the marriage, CL was living with a female roommate in Jacksonville, Florida, while her husband was stationed at Fort Stewart. At some point, a man ended up living in the apartment with them. After a month of living with the man, CL had an affair with him that lasted for three months. After ending the affair out of guilt, she told her husband about it.

When CL's husband learned of his wife's affair, he kicked down the door of the former paramour. CL's husband testified that although he had not told anyone what he would do if his wife had another affair, "a lot of people that know me know that I'm hot tempered." Despite the fact of the first affair, CL testified that it tended to make their marriage stronger, and her husband testified that the marriage was "all good." At the time of trial, they also had a two-year-old child.

## B.

The military judge ruled that the proffered evidence was inadmissible under M.R.E. 412 and determined that it was

marginally relevant to show that CL had a motive to lie. In particular, the military judge concluded that the evidence of the previous affair was stale because it had occurred two and one-half years earlier. She further determined that CL had no reason to believe that a second affair would have led to a divorce, because CL's marriage was stronger after the first affair, and the couple now had a child. She stated that it was speculative to conclude that a second affair would have resulted in a divorce.

Furthermore, the military judge concluded that the probative value of the evidence did not outweigh its dangers to CL's privacy interests. She also determined that under M.R.E. 403, the dangers of unfair prejudice -- waste of time and confusion of the issues -- substantially outweighed the probative value of this evidence. For these reasons, the military judge concluded that the evidence was not constitutionally required.

The CCA held that the military judge did not abuse her discretion in excluding the evidence. Ellerbrock, 2010 CCA LEXIS 32, at *9, 2010 WL 3931488, at *3. The CCA further held that even if the military judge erred, any error was harmless beyond a reasonable doubt, because defense counsel could and did argue that CL had a motive to fabricate about the consensual

United States v. Ellerbrock, No. 10-0483/AR

nature of the sex even without evidence of the prior affair.

Id. at *15-*16, 2010 WL 3931488, at *5.

III.

A.

We review the military judge's ruling on whether to exclude evidence pursuant to M.R.E. 412 for an abuse of discretion. United States v. Roberts, 69 M.J. 23, 26 (C.A.A.F. 2010). Findings of fact are reviewed under a clearly erroneous standard and conclusions of law are reviewed de novo.  Id.

B.

M.R.E. 412[4] states that evidence offered by the accused to prove the alleged victim's sexual predispositions, or that she engaged in other sexual behavior, is inadmissible except in

---

[4] Appellant's trial was completed on August 15, 2007.  Executive Order 13,447, which amended M.R.E. 412(c)(3) to include the problematic language of "to the alleged victim's privacy," was not released until September 28, 2007, more than a month after the trial.  Exec. Order No. 13,447, 3 C.F.R. 243 (2008).  The military judge, however, still conducted a balancing that relied heavily on the victim's privacy interest, a position this Court appeared to adopt in United States v. Banker, 60 M.J. 216 (C.A.A.F. 2004).  See Manual for Courts-Martial, United States, Analysis of the Military Rules of Evidence app. 22 at A22-36 (2008 ed.) (noting that the amended language in M.R.E. 412(c)(3) was meant to "highlight current practice" in military law, citing Banker as inspiration).  Therefore, even though the military judge did not apply the current version of M.R.E. 412, she applied a balancing test consistent with how the rule is currently written.  Therefore, the balancing conducted by the military judge in this case raises the same concerns as if the balance had been conducted in accordance with the 2007 amendment to the rule.

limited contexts.  M.R.E. 412(a)-(b).  The rule "is intended to 'shield victims of sexual assaults from the often embarrassing and degrading cross-examination and evidence presentations common to [sexual offense prosecutions].'"  United States v. Gaddis, No. 10-0512, 2011 CAAF LEXIS 669, at *9, 2011 WL 3518169, at *3 (C.A.A.F. Aug. 10, 2011) (alteration in original) (quoting Manual for Courts-Martial, United States, Analysis of the Military Rules of Evidence app. 22 at A22-35 (2008 ed.)).  While there are three exceptions set out in the rule, we are concerned only with the third, which states that the evidence is admissible if "the exclusion of . . . [it] would violate the constitutional rights of the accused."  M.R.E. 412(b)(1)(C).

The exception for constitutionally required evidence in M.R.E. 412(b)(1)(C) includes the accused's Sixth Amendment right to confrontation.  Banker, 60 M.J. at 216, 221 (citing Weinstein's Federal Evidence § 412.03[4][a] (2d ed. 2003)).  An accused has a constitutional right "to be confronted by the witnesses against him."  U.S. Const. amend. VI.  That right necessarily includes the right to cross-examine those witnesses. Davis v. Alaska, 415 U.S. 308, 315 (1974) (citing Douglas v. Alabama, 380 U.S. 415, 418 (1965)).  In particular, the right to cross-examination has traditionally included the right "'to impeach, i.e., discredit the witness.'"  Olden v. Kentucky, 488 U.S. 227, 231 (1988) (quoting Davis, 415 U.S. at 316).

9

However, an accused is not simply allowed "'cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986) (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam)). Indeed, "'trial judges retain wide latitude' to limit reasonably a criminal defendant's right to cross-examine a witness 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" Michigan v. Lucas, 500 U.S. 145, 149 (1991) (quoting Van Arsdall, 475 U.S. at 679). But no evidentiary rule can deny an accused of a fair trial or all opportunities for effective cross-examination. See Van Arsdall, 475 U.S. at 679.

Generally, evidence must be admitted within the ambit of M.R.E. 412(b)(1)(C) when the evidence is relevant, material, and the probative value of the evidence outweighs the dangers of unfair prejudice. See Gaddis, 2011 CAAF LEXIS 669, at *20, 2011 WL 3518169, at *6 ("[T]he best reading of the rule is that, as in its prior iteration, the probative value of the evidence must be balanced against and outweigh the ordinary countervailing interests reviewed in making a determination as to whether evidence is constitutionally required."). Relevant evidence is any evidence that has "any tendency to make the existence of any

fact . . . more probable or less probable than it would be without the evidence." M.R.E. 401. The evidence must also be material, which is a multi-factored test looking at "'the importance of the issue for which the evidence was offered in relation to the other issues in this case; the extent to which the issue is in dispute; and the nature of the other evidence in the case pertaining to th[at] issue.'" Banker, 60 M.J. at 222 (quoting United States v. Colon-Angueira, 16 M.J. 20, 26 (C.M.A. 1983)). Finally, if evidence is material and relevant, then it must be admitted when the accused can show that the evidence is more probative than the dangers of unfair prejudice. See M.R.E. 412(c)(3). Those dangers include concerns about "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679.

## IV.

In this case, the record indicated that CL did not want her marriage to end, which tends to show that she had a motive to fabricate about whether the sexual intercourse with Appellant was consensual, namely to protect her marriage. See United States v. Smith, 68 M.J. 445, 448-49 (C.A.A.F. 2010) (recognizing that protecting an established relationship provides a motive to lie about the consensual nature of sexual encounters). The issue presented is whether Appellant was

denied his rights under the constitutionally required exception in M.R.E. 412(c)(3), when the military judge prevented him from presenting a theory that a previous affair made it more likely that CL would have lied in this case.

It is a fair inference that a second consensual sexual event outside a marriage would be more damaging to a marriage than would a single event, assuming the evidence in the record supported that inference. The primary concern expressed by the dissents is that Appellant did not present sufficient evidence to make such an inference relevant and probative in this case. We disagree.

Although common sense is the guiding principle for Appellant's theory for admitting evidence of CL's prior affair, see 1 Kenneth S. Broun et al., McCormick on Evidence § 185 (6th ed. 2006) (stating that determinations of relevancy must be based on "personal experience, general knowledge, and understanding of human conduct and motivation"), the evidence in this case sufficiently supports Appellant's theory. After her prior affair, CL admitted that she was afraid that her husband would divorce her. Her concerns would not abate after a potentially second illicit sexual encounter, especially in light of her husband's reaction to her first affair -- kicking down the former paramour's door.

CL's knowledge of her husband's reaction to her first affair makes it more likely she would have lied than if she did not know these facts. Her husband underscored this point when the military judge asked, "Specialist [L], have you ever told anyone what you would do if your wife had had an affair?" He responded, "Not to my knowledge, ma'am, but a lot of people that know me know that I'm hot tempered." A reasonable reading of the husband's response is that his "hot tempered" reaction to the first affair was not an aberration, which is something that "a lot of people" knew, including CL. The military judge's conclusion that CL had no additional motivation to lie about a potential second affair because her marriage was stronger after the first was erroneous because it ignored the evidence and oversimplified the situation.

Furthermore, the military judge was incorrect to conclude that this evidence was too stale to be relevant. Time does not affect all evidence equally. See United States v. Kane, 726 F.2d 344, 348 (7th Cir. 1984) (recognizing that mere passage of time does not make evidence irrelevant, as it will also depend on the nature of the evidence and its relation to what is to be proven). If CL engaged in consensual sexual intercourse with Appellant, then her previous affair, which was only two and one-half years old at the time, might well have been a relevant consideration to her husband's decision in whether to continue

13

on with the marriage.  In light of her husband's reaction to the previous affair, one cannot discount that CL likely knew of the real danger a second affair might cause to her marriage.

Therefore, contrary to the military judge's ruling, evidence of CL's prior affair, including her husband's reaction to it, has a direct and substantial link to CL's credibility, a material fact at issue.  See United States v. Stavely, 33 M.J. 92, 94 (C.M.A. 1991) (noting that evidence directly probative of a witness's truthfulness is always relevant to the issue of credibility).  Here, the existence of a prior affair may have established a greater motive for CL to lie about whether her sexual encounter with Appellant was consensual.  Because the evidence has a tendency to prove or disprove a substantial issue in question, it is both relevant and material.

The final step in deciding whether evidence of CL's first affair was required to be admitted is to balance the probative value of the evidence against the dangers of unfair prejudice.  Gaddis, 2011 CAAF LEXIS 669, at *20, 2011 WL 3518169, at *6.  Here, the probative value of this evidence is high.  Since the other witnesses' testimony was conflicting, the credibility of CL's testimony about whether she consented was crucial to Appellant's conviction.  And, as discussed above, evidence of CL's prior affair has a direct and substantial link to CL's credibility; thus, this evidence is highly probative.

Furthermore, the military judge overstated the M.R.E. 403 concerns in this case. There is no dispute as to whether the affair occurred. As such, this evidence was unlikely to result in a waste of time or lead to a trial within a trial to determine whether past events actually occurred. Confusion of the issues was also unlikely, given that the theory of relevance was relatively straightforward. And with proper instructions from the military judge on how the members could use this evidence, there is little concern that the members would have been misled. See United States v. Walker, 42 M.J. 67, 74 (C.A.A.F. 1995) (recognizing that the military judge's instructions to members on the proper use of testimony could have resolved M.R.E. 403 issues).

Because evidence of CL's prior affair was relevant, material, and the probative value of the evidence outweighed the dangers of unfair prejudice, the evidence of CL's prior affair was constitutionally required in this case. The exclusion of CL's prior affair constituted a constitutional error, which means we must test the error to see if it was harmless beyond a reasonable doubt -- whether "'there is a reasonable possibility that the evidence [or error] complained of might have contributed to the conviction.'" United States v. Moran, 65 M.J. 178, 187 (C.A.A.F. 2007) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)).

V.

To determine whether an error affecting an accused's right to cross-examination was harmless beyond a reasonable doubt, we apply the test developed in Van Arsdall, which states the following nonexclusive, five factors:

> [T]he importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

475 U.S. at 684.

In this case, CL's testimony was important to the Government's case. Although three eyewitnesses saw CL and Appellant having sex, they did not provide a coherent picture of her mental capacity before, during, or after the alleged rape. This is problematic, since the sole issue in this case was whether CL consented. As such, CL's testimony about consent was crucial to Appellant's conviction. This factor weighs in favor of finding harm. Furthermore, absolutely no evidence of CL's prior marital affair was admitted; therefore, cross-examination on this subject would not have been cumulative. This factor also weighs in favor of finding harm.

Although some evidence corroborated CL's version of events, there were significant contradictions in the witnesses' testimony. For instance, there was varying testimony about how

much Xanax CL actually ingested or whether she snorted any.

Ellerbrock, 2010 CCA LEXIS 32, at *2-*3, 2010 WL 3931488, at *1.

There was conflicting testimony as to when and if CL passed out and vomited.  Indeed, the toxicologist called by trial counsel summarized the degree of doubt over CL's intoxication in testifying that she "exhibit[ed] anywhere from minimal effects of sedation . . . to being precomatose."  Based on the Government's theory, the difference between CL's being minimally sedated and precomatose may have been the difference between consensual sex and rape.  This factor also leans in favor of finding harm.

Even though CL was subjected to substantial cross-examination, none of the questions were about her previous affair.  As such, this factor also leans towards a finding of harm.  See Roberts, 69 M.J. at 29 (recognizing that extensive cross-examination of the witness alone is not enough, if the cross-examination permitted did not include questions on the issue constitutionally required).

Finally, the prosecution's case was not overwhelming.  Even though the witnesses saw Appellant and CL having sex, they failed to provide a coherent picture of CL's mental capacity before, during, or after the alleged rape.  Because the only issue at trial was whether she could and did consent, her testimony on that issue became crucial to Appellant's

conviction.  This factor also leans towards finding harm, especially since evidence of CL's previous affair could have reasonably called into question the credibility of CL's testimony.

Under the circumstances of this case, "'[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense counsel] been permitted to pursue his proposed line of cross-examination.'"  Smith, 68 M.J. at 451 (alterations in original) (quoting United States v. Collier, 67 M.J. 347, 352 (C.A.A.F. 2009)).  As such, we are convinced that there is a "reasonable possibility that the evidence [or error] complained of might have contributed to the conviction."  United States v. Ashby, 68 M.J. 108, 122 (C.A.A.F. 2009) (alteration in original) (citation and quotation marks omitted).  Therefore, we find this error was not harmless beyond a reasonable doubt.

## VI.

The judgment of the United States Army Court of Criminal Appeals is reversed as to the findings of guilty of rape and sodomy by force. Those findings and the sentence are set aside. The findings of guilty of the offenses to which Appellant pled guilty are affirmed.  A rehearing may be ordered.

18

BAKER, Judge (dissenting):

I respectfully dissent.  I do not believe the military judge abused her discretion in applying Military Rule of Evidence (M.R.E.) 412 to the evidence at issue in this case. The evidence had low probative value, raised significant M.R.E. 412 balancing concerns, and was not vital to the defense;[1] therefore it fell within the military judge's discretion to exclude the evidence.

Appellant failed to produce an evidentiary foundation for introducing the proffered evidence that is otherwise excluded under M.R.E. 412.  In particular, defense counsel failed to show a direct nexus between the evidence the defense sought to introduce, and the incident at issue in this case.  As a result, exclusion of this evidence did not deprive Appellant of the opportunity to present a defense.

The circumstances of CL's affair with JH and the incident with Appellant were very different:  rather than an ongoing affair, this was a one-night sexual encounter with varying accounts as to the victim's consciousness.  The victim, CL, has no history of false allegations of rape -- on the contrary, it was she who told her husband of her consensual affair with JH a few days after it ended.  Moreover, the defense theory of

---

[1] I use the word vital to mean that which is consistent with the constitutional guarantee of "a fair opportunity to present a defense."  Crane v. Kentucky, 476 U.S. 683, 687 (1986).

admissibility rested on just the sort of presumption M.R.E. 412 is intended to address, namely, that "a previous affair made it more likely that CL would have lied." United States v. Ellerbrock, __ M.J. __ (12) (C.A.A.F. 2011). As a result, the military judge correctly required a direct factual nexus between the prior affair and the incident with Appellant before permitting testimony about the affair with JH. Appellant did not provide such a nexus. Neither the victim nor her husband testified that either of them expected, threatened, or feared "what would happen if there was further infidelity in" the marriage. Defense counsel had the opportunity to question each witness on these points, and neither made a statement that supported the defense theory that the marriage would not survive another incident, or that the victim feared this.

The majority bridges this evidentiary gap with a conclusion about human nature, stating that "common sense is the guiding principle for Appellant's theory for admitting evidence of CL's prior affair . . . determinations of relevancy must be based on 'personal experience, general knowledge, and understanding of human conduct and motivation.'" Id. at __ (12) (citations omitted). The majority postulates, "[T]he existence of a prior affair may have established a greater motive for CL to lie about whether her sexual encounter with appellant was consensual." Id. at __ (14). It may have done so, but there is no evidence

2

it did do so.  The link appears to be based on a "common sense" understanding that a married person who has had an affair is more likely to later fabricate a rape allegation with a stranger than someone who has not.  That is the type of presumption about the sexual propensity and moral character of a sexual assault victim that M.R.E. 412 is intended to exclude.  Moreover, the logic of the argument implies that any prior fact that would place additional stress on a marriage is constitutionally required to be admitted where a married woman is the victim of a sexual assault and the defense is based on consent.

M.R.E. 412 requires significantly more.  It requires a concrete evidentiary proffer rather than just a theory.  This proffer must demonstrate why the evidence offered is material, the manner in which it is material and probative, and why its probative value outweighs the privacy interests of the victim.

DISCUSSION

A.  M.R.E. 412

M.R.E. 412 is a rape shield law.  It is intended to protect the privacy of victims of sexual assault while at the same time protecting the constitutional right of an accused to a fair trial through his right to put on a defense.  It accomplishes the first objective by limiting the opportunity of an accused to inquire into the past sexual conduct of the victim and from using innuendo and propensity to demonstrate consent.  It

3

accomplishes the second objective by expressly recognizing that some evidence, which otherwise would fall within the parameters of M.R.E. 412, is essential to a fair trial and is thus constitutionally required.

The rule's constitutional foundation rests upon the Supreme Court's determination in Michigan v. Lucas that "The right to present relevant testimony is not without limitation.  The right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."  500 U.S. 145, 149 (1991) (quotation marks omitted).

In the military context, these legitimate interests extend beyond those recognized in the civilian context.  They include a societal interest in the reporting and prosecution of sexual offenses and maintenance of a justice system that is fair to both the accused and to the victims.  They also include maintenance of good order and discipline in the military as well as the morale and welfare of those who serve in the armed forces.  M.R.E. 412 is a rule of exclusion in light of the societal interests at stake.  Manual for Courts-Martial, United States, Analysis of the Military Rules of Evidence app. 22 at A22-35 (2008 ed.) (MCM) [hereinafter Drafters' Analysis].

B.  The M.R.E. 412(c)(3) Exception

The plain text of M.R.E. 412 establishes a three-part test to determine whether evidence is constitutionally required.

4

First, the evidence must be relevant.[2]  This, of course, is a baseline and not a finish line.[3]

Second, the evidence must be material, as determined by "the importance of the issue for which the evidence was offered in relation to the other issues in the case; the extent to which this issue is in dispute; and the nature of the other evidence in the case pertaining to this issue."  United States v. Banker, 60 M.J. 216, 223 (C.A.A.F. 2004) (quotation marks and citation omitted).

Finally, in general the probative weight of the evidence must outweigh the privacy interests of the victim.  It is true that M.R.E. 412(c)(3) evidence may be sufficiently relevant and material -- its probative value sufficiently high -- that it may be essential to an accused's constitutional right to put on a

---

[2] Relevance is "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  M.R.E. 401.  While this is a low bar, I remain unconvinced that the defense demonstrated that the prior affair made any fact in the current charges more or less likely because they failed to submit any reason other than sexual propensity (an impermissible use) or speculations regarding CL's motivation as a married woman (an unsubstantiated theory of admission).

[3] See United States v. Sullivan, in which this Court upheld the need for a basic show of relevance in order to admit evidence even in a case that did not implicate the additional restrictions of M.R.E. 412:  "An accused does not have a right to cross-examine a witness on any subject solely because he describes it as one of credibility, truthfulness, or bias.  There must be a direct nexus to the case that is rooted in the record."  70 M.J. 110, 115 (C.A.A.F. 2011).

defense regardless of how it balances against the victim's privacy.  If so, its probative weight will necessarily outweigh any privacy interests of the victim.  Such evidence in the vernacular of case law is termed "favorable," or "vital" to the accused, and is constitutionally required because the accused has a right to a fair trial and an opportunity to put on a defense.

Determining if a piece of evidence meets this standard can be made in deliberate and sequential fashion as the military judge works through the rule.  Alternatively, based on the facts of a case it might appear so obvious to the military judge that on the face of the evidence it is vital to the defense, obviating the need to engage in any balancing.  However, not all evidence that is relevant and material is essential to the right to put on a defense.  Otherwise, the drafters of the MCM would not have structured the rule in a manner that had the balancing test textually follow the military judge's threshold determinations on relevance and materiality.  Indeed, most M.R.E. 412 evidence proffered in connection with a viable constitutional theory of admission will not fall crisply into black and white categories of constitutional inclusion or privacy exclusion.  Neither do most M.R.E. 412 cases involve singular proffers of evidence.  The M.R.E. 412 balancing test promulgated by the President therefore serves as a mechanism for

military judges to accommodate multiple and weighty constitutional issues and values without dealing in all-or-nothing absolutes of inclusion or exclusion. As a result, where the balancing is close, a military judge will not necessarily abuse her or his discretion by including or excluding evidence. A military judge does not abuse her or his discretion in excluding evidence if the defense proffer is relevant and material but of such low probative value that it is outweighed by the privacy interest of the victim. Likewise, if in applying the balancing test the military judge determines that the probative value of the evidence outweighs the risk of unfair prejudice, then it is also within the military judge's discretion to admit the evidence -- after, of course, applying any other applicable rules of evidence, such as M.R.E. 403. However, it is also important to note that evidence may not emerge as "vital" until after an initial M.R.E. 412 ruling. Thus, it is possible for a military judge to correctly apply M.R.E. 412 in excluding evidence, but err by not later reconsidering that ruling.

In sum, M.R.E. 412 does not preclude an accused from putting on evidence related to a spouse's prior extramarital affair. It does provide for a military judge, in her or his discretion, to preclude an accused from doing so absent a direct material and evidentiary connection between the theory of

admissibility and the facts of the specific case -- in other words, a showing that the evidence is relevant, material, and potentially vital.

C.  Applying the Test in This Case

In this case, the evidence indicates the following as reflected in the military judge's findings of fact and conclusions:

CL and Corporal BL married in August 2004.  Approximately two to three months later, CL commenced a consensual sexual relationship with JH.  This occurred two and one half years prior to the incident at issue.  JH was a friend of CL's female roommate who temporarily moved in to their apartment.  The relationship was ongoing and continuous and ended "of its own accord in December 2004."  CL "voluntarily informed her husband of the affair immediately after it ended.  She also confided in her parents, friends, and a neighbor."  She felt guilty.  As the military judge stated in her findings:

> Upon learning of the affair, he [BL] did not threaten to leave CL, but he kicked down a door and was incarcerated for three days in a local jail.  BL and CL worked out their marital problems and remain married to the present day. Both CL and BL believe their marriage is stronger because of the affair.

With respect to the incident for which Appellant was charged, the military judge found that CL did not know Appellant before the night in question.  In addition, the expert toxicologist

8

testified that CL's consumption of drug and alcohol would leave CL inebriated somewhere between sedated and comatose; and different witnesses perceived different sounds upon their return to the house.[4]

This Court reviews a military judge's decision to exclude evidence subject to M.R.E. 412 for an abuse of discretion. Banker, 60 M.J. at 223.

(1) Probative Value

At trial, Appellant sought to introduce evidence of CL's affair with JH for the purpose of showing CL's motive to fabricate because she feared a similar and more severe reaction to the discovery of another extramarital sexual encounter and more generally to protect her marriage.

In response, the military judge made the following conclusions on the record:

> [CL]'s extramarital affair is remote in both time and manner to the rape and forcible sodomy charges before the court. Not only did the affair occur two and a half years ago, but it began after [CL] became intimate with a man she saw on a daily basis for a month. . . . [CL] and the accused did not previously know one another.

---

[4] Private Page testified that he recognized the voice moaning and it was "Just the sound of [Appellant]." SPC Jackson stated that he heard "sexual noises" that "sounded like a female type voice" but when they opened the door, he saw the victim, eyes closed, "[h]er head just laying there limp." When the defense counsel stated that "the complainant was moaning prior to the individuals coming into the room seeing her in there with PFC Ellerbrock," the military judge responded, "That's a proffer on your part. There's been no evidence so far before this court to that whatsoever."

9

. . . .

> There is no pattern of rape allegations; [CL]'s allegation
> of rape against the accused is the first rape allegation
> she has lodged.  There is no pattern of extramarital
> affairs by [CL]; the affair occurred 2 1/2 years ago is the
> only incident of infidelity in the [L]'s marriage.  There
> is no evidence that the affair destroyed or even weakened
> [the] marriage; in fact, they remain married, have had a
> child since the revelation of the affair, and the evidence
> shows their marriage is now stronger.

> There is no evidence that [BL] told [CL] that if she had
> another affair, he would leave her, end the marriage, or
> react in any other way.

The majority does not find the military judge's findings of fact
clearly erroneous.  However, the majority concludes that "the
military judge erred in applying [M.R.E.] 412 to prevent
Appellant from introducing evidence of the alleged victim's
first marital affair."  Ellerbrock, __ M.J. at __ (2) (emphasis
added).  In my view, the military judge did not abuse her
discretion for four reasons.

(a) First, there is no evidence to suggest, as the majority
does, that the encounter between Appellant and CL was a second
marital affair.  The logic of Appellant's argument changes
significantly if the incident with Appellant is viewed as a
"second affair."  There is no doubt that a prior sexual affair
could be probative in assessing someone's credibility and motive
to fabricate.  As a matter of logic, for example, a "second"
affair would be more damaging to a marriage than would a single
affair, if other factors remain the same and the evidence

10

indicates as much.  However, there is no evidence whatsoever in the record that CL was engaged in an affair with Appellant.

(b) Second, if one does not treat the incident with Appellant as a second affair, then it was either a rape or a one-night stand.  In that case the theory of admission necessarily rests on the view that a married woman who has had an affair is more likely to falsely allege rape to protect her marriage two years later than a woman who has not had a prior affair.

This theory of admission is inherently problematic because it is not based on the facts in evidence, but rather on a presumption about human nature.  There is no evidence in the record that the prior affair put the marriage on tenterhooks at the time of the rape.  The evidence seems to suggest otherwise. The military judge stated on the record, "There is no evidence that the affair destroyed or even weakened [the] marriage; in fact . . . the evidence shows their marriage is now stronger." This finding may be counterintuitive, but it is supported by facts in the record.  Neither is there evidence in the record that either CL or BL made statements or raised concerns about what might happen to their marriage in the event of a subsequent sexual encounter outside the marriage or other stressful event. The notion that their marriage would end if an additional stressor occurred was either not factually accurate or was not

elicited by counsel, even though counsel was given the opportunity to establish a factual basis for this claim in the Article 39(a)[5] session.

Furthermore, the extramarital affair was not consistent in time, place, manner or (perhaps most importantly) manner of discovery, with the charges that were before the court-martial. The affair was over two years prior, JH was a person whom CL knew and was living with for a period of months, and CL did not end the prior relationship with an allegation of rape. She ended it voluntarily, and then told her husband about the relationship. The incident in this case involved two strangers, one of whom was inebriated and either engaged in consensual sex or was raped. Therefore, we are not dealing here with a pattern of conduct, or a pattern of conduct indicative of deceit.

(c) Third, to the extent the defense theory rested on more than a presumption about human nature, which M.R.E. 412 precludes, it depended on Appellant's angry reaction to the affair with JH. The defense argued that BL's previous angry reaction when he broke a door was the specific evidence they sought to bring in (as distinct from the general existence of the affair or CL's propensity to engage in extramarital sex). However, the defense did not demonstrate that this evidence was

---

[5] Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 939(a) (2006).

12

both material and highly probative, and thus vital, to

Appellant's opportunity to put on a defense.[6]

It is intuitive that a spouse might express anger toward

someone who engages in consensual sex with his spouse.  Indeed,

one might expect a husband to show equal if not greater anger in

the event that his spouse was raped as opposed to engaging in a

consensual one-night stand.  Moreover, BL was deployed in Iraq

at the time; thus the prospect of an immediate and violent

reaction to the incident was geographically removed.  And CL did

not testify that she feared BL's response to learning of the

incident.

(d) Finally, even if Appellant's theory of admission was

valid, the evidence offered by Appellant in support of the

theory was of little probative value.  It is intuitive that a

spouse might have a motive to hide a consensual sexual encounter

outside the marriage regardless of any past affair.  As the

majority notes, it is common sense that a married man or woman

might lie about a consensual sexual event in order to protect a

marriage.  However, it is not clear why the existence of a prior

affair alone makes it any more likely the offending spouse would

---

[6] The military judge explicitly gave defense counsel opportunity
to explain the relevance of the evidence, that is, to
demonstrate its tendency to prove or disprove a fact at issue in
the case.  M.R.E. 401.  In the M.R.E. 412 session, the military
judge repeatedly asked for the defense counsel to establish
relevance.  It is the military judge's responsibility to make
determinations of admissibility in an ongoing trial.

do so.   One could even argue based on the facts in this case that it made it less likely because CL reported the affair herself.

As a result, evidence standing alone that CL had once had an extramarital affair that prompted BL to kick a door down was not essential, i.e., vital, to Appellant's opportunity to put on a defense.   Therefore, the military judge appropriately sought to balance the probative weight of the proffer against the privacy interests of the victim.

(2) CL's Privacy Interest

The record contains two statements directly addressing the victim's privacy interests.   First, in response to the military judge's question, "How would you feel about [the fact that you had this extramarital affair] coming out in open court today?" CL responded:   "Well, honestly, I don't see it having any relevance to him raping me.   I don't see how that -- you know -- matches up.   If it was to come out, then it comes out.   There's nothing I can do about that."   In response to the military judge's question "about these perfect strangers in this courtroom finding out that you had an affair," CL responded:   "I don't think it is any of their business."   She also told defense counsel, "I'm not afraid for it to come out, but it would still be embarrassing because it's defacing my character in front of people I don't know."

The majority does not address CL's privacy interest. Presumably this is because CL had told others about the affair with JH, appeared to have reconciled to the fact of its occurrence, and seemed aware of the possibility that it would come out at trial.  The victim's privacy interest in this case is not as compelling as in some cases.  However, the fact that one has told family and friends something does not mean that the information would not result in "defacing [one's] character" "in front of people [one] do[esn't] know."  CL said as much.

Thus, on this record, the military judge did not abuse her discretion in excluding the evidence on probative or privacy grounds.  She certainly did not do so in the context of the purpose of M.R.E. 412 or in the manner in which she applied the M.R.E. 403 balancing test to the evidence.

In my view, the military judge correctly considered the broader implications of her ruling on the privacy interests intended to be protected by M.R.E. 412, as reflected in the military judge's conclusion that "[t]o allow evidence of [CL]'s previous extramarital affair [without a specific predicate] would mean that anytime a married woman alleges rape, her complete sexual history during the marriage becomes relevant to show bias."  Under the majority's reasoning, in the case of a sexual assault trial, it would seem constitutionally required to permit inquiry on any stressor upon the marriage, past or

15

present, sexual or not, because such stressors might always serve as a basis to protect the marriage or made the other spouse angry.  In my view, something more is needed, or the legitimate privacy interests that the rule seeks to balance and protect will be swept aside.

Further, the military judge's M.R.E. 403 concerns about confusing the issues appear well founded, and in any event, are not erroneous.  This Court has discouraged the introduction of evidence which results in a "distracting mini-trial on a collateral issue."  United States v. Berry 61 M.J. 91, 97 (C.A.A.F. 2005) (quoting United States v. Bailey, 55 M.J. 38, 41 (C.A.A.F. 2001) (quotation marks omitted).  That appears to be exactly what has occurred in this case at all levels of judicial process.  M.R.E. 412 derives in part from recognition that this interest in avoiding the mini-trial is heightened when the evidence has a tendency to embarrass or degrade the witness/victim.[7]

In conclusion, because the military judge's findings of fact are not clearly erroneous and her application of the law on the record is sound and consistent with the legitimate purposes of M.R.E. 412 and the constitutional interests it seeks to

---

[7] M.R.E. 412 "is intended to shield victims of sexual assaults from the often embarrassing and degrading cross-examination and evidence presentations common to prosecutions of such offenses." Drafters' Analysis app. 22 at A22-35).

16

protect, she did not abuse her discretion in excluding the

evidence at issue in this case.

United States v. Ellerbrock, No. 10-0483/AR

RYAN, Judge (dissenting):

I respectfully disagree that the military judge's limitation on cross-examination in this case was an abuse of discretion.

With respect to the Sixth Amendment's Confrontation Clause,[1] "trial judges retain wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986); see also Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam); United States v. Collier, 67 M.J. 347, 353 (C.A.A.F. 2009); United States v. James, 61 M.J. 132, 136 (C.A.A.F. 2005). The question is whether a reasonable panel would have received "a significantly different impression" of CL's credibility had Appellant been permitted to cross-examine her on the prior affair. See Van Arsdall, 475 U.S. at 680.

I agree with Judge Baker that such evidence was marginally relevant and probative, and precisely the sort of evidence that Military Rule of Evidence 412 was intended

---

[1] "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.

to exclude.  United States v. Ellerbrock, __ M.J. __, __-__ (1-3) (C.A.A.F. 2011) (Baker, J., dissenting).  The defense counsel was permitted to cross-examine CL on the numerous self-evident bases for her motive to fabricate and to argue the same to the members.  On cross-examination, the defense established that CL had been married to her husband (who was deployed to Iraq at the time of the alleged rape) for three years at the time of trial, and that Specialist Jackson -- who had witnessed the alleged rape -- was very good friends with her husband.  The defense also established that CL had ingested Xanax and alcohol while socializing with friends on the night of the alleged rape. Finally, the defense established that CL's initial sworn statement to investigators differed from her court-martial testimony in that she had not told investigators that Appellant had anal sex with her in the middle of the night and that she had told him to stop.  Having established all this, defense counsel argued as follows during closing argument:

> When you look at the Complainant, what's her motive to fabricate?  She's married; living on post; husband is deployed; [s]he has friends over [at] the house on a Tuesday night; start drinking.  How does she explain these events to her husband, who's deployed? . . . Why would she have to explain that to her husband?  Well, because his best friend, his close friend, is Specialist Jackson.

Defense counsel then argued, "how do we know that [the sex] wasn't consensual?  We don't know that."  Thus, the defense established the rather self-evident proposition that a married woman whose husband is deployed would have a motive to allege that sex with another -- occurring after a social event at which her husband's good friend was present -- was not consensual.

"When reviewing the adequacy of a cross-examination, the question is whether the jury had sufficient information to make a discriminating appraisal of the witness's motives and bias."  United States v. Nelson, 39 F.3d 705, 708 (7th Cir. 1994) (quotation marks and citations omitted).  Here, the members had sufficient information to make a discriminating appraisal of CL's motive to lie to protect her marriage.  Cf. Davis v. Alaska, 415 U.S. 308, 317-18 (1974) (finding a Confrontation Clause violation where the defense was not permitted to present its theory of bias so that the jury could make "an informed judgment" as to that theory).  Evidence of CL's prior affair would have added little or nothing to this motive for the reasons set forth in Judge Baker's separate opinion.  Ellerbrock, __ M.J. at __-__ (10-15) (Baker, J., dissenting).  "Additional cross-examination on this topic would not have established a potential motive to lie but merely would have embellished

facts already showing that motive." Nelson, 39 F.3d at 709; see also United States v. Carruthers, 64 M.J. 340, 344 (C.A.A.F. 2007). Thus, the military judge provided Appellant with "what he was due under the Confrontation Clause: an opportunity to impeach the complainant's credibility." See United States v. Smith, 68 M.J. 445, 448 (C.A.A.F. 2010).

For these reasons, and because military judges have "wide discretion to limit repetitive cross-examination or to prohibit cross-examination that may cause confusion," James, 61 M.J. at 136, evidence of CL's prior affair was not constitutionally required to be admitted, and the military judge correctly excluded it. I would therefore affirm the decision of the United States Army Court of Criminal Appeals.